# United States Court of Appeals for the Fifth Circuit

———————

No. 23-50297

———————

United States Court of Appeals
Fifth Circuit

**FILED**

March 5, 2024

Lyle W. Cayce
Clerk

Dean Chase,

*Plaintiff—Appellant*,

*versus*

Ryan E. Hodge; Helping Hands Capital, L.L.C., *a Texas Limited Liability Company*,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:20-CV-175

———————————————————

Before Davis, Southwick, and Ho, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

This litigation is a business dispute over the formation and ownership of a limited liability company. The plaintiff alleges there was an agreement with the defendant that the plaintiff would be an equal owner of the business, but the company was improperly formed with the defendant as the sole owner. The district court granted summary judgment to the defendant based on, among other grounds, the statute of limitations and the statute of frauds. We AFFIRM.

No. 23-50297

## FACTUAL AND PROCEDURAL BACKGROUND

Dean Chase, Ryan E. Hodge, and Mark Guedri owned HMR Funding, a business that provided case-expense loans for litigants. In 2013, they decided to form a business to make pre-settlement medical advancement loans to litigants, with the loans to be secured by future proceeds of any lawsuit settlement. Chase alleges Hodge, as attorney for both Chase and Guedri, was to form the entity, and the parties would have equal ownership interests in the business and split the profits equally. There is no written agreement among the parties and thus no text to interpret.

Helping Hands Capital, LLC was formed as a Texas limited liability company on March 28, 2013. Only Hodge was listed on the Certificate of Formation as the managing member of the business. Hodge was also named in the initial Company Operating Agreement as the sole owner of Helping Hands' member units. Neither Guedri nor Chase was ever listed as owners in any document.

In 2016, Guedri transferred any interest he had in Helping Hands back to the business. Chase's sworn declaration states that after the transfer, Hodge informed him they were now 50/50 partners. Distributions to both Hodge and Chase were made on a 50/50 basis until early 2018. Chase then began insisting that Hodge provide him with Helping Hands' financial information, but Hodge responded in April 2018 that Chase held an "economic benefit only" in the company, not "legal ownership," and Helping Hands was "owned 100% by a trust." Chase contends that this was the point when Hodge began excluding him from the business, causing a breach of contract claim to accrue.

In an April 2018 email, Hodge wrote Chase that the agreement among the three initial parties was "a gentleman's agreement of ownership," but neither Chase nor "Guedri have ever made any capital contributions to the

No. 23-50297

company nor have either of [them] ever made any capital available to the company in any form." The agreement was not one where they would each be owners but was one "for distribution of economic interests." Hodge, after writing in an email that the company was owned by a trust, later described Chase's interest as "economic benefit only and not legal ownership." Hodge also wrote that some of the lawyers with whom Helping Hands does business "do not hold [Chase] in high regard," and it was important that none of them believe Chase was an owner.

Chase and Hodge met in Washington, D.C. in May 2018 to resolve their ownership disputes. Hodge allegedly reassured Chase they were 50/50 partners in Helping Hands; they would continue to work together on the business; and Chase would have "complete and unlimited access" to all Helping Hands' books. Chase insists such access was never provided, though Hodge did forward "preliminary financials" to Chase in January 2019.

Chase's affidavit asserts he had no idea Hodge would not honor their agreement and tried to resolve their disagreements throughout 2019. Chase's affidavit states that Hodge confirmed several times, both orally and in writing, the existence of a 50/50 ownership agreement. Further, Chase was asked to vote on periodic corporate matters. In September 2019, Hodge emailed Chase and requested that Chase sell his interests to him, or, in the alternative, threatened to transfer Chase's money out of the company and dissolve it.

Chase filed a petition in Texas state district court in February 2020, naming Hodge, his ex-wife Stephanie Hodge,[1] and Helping Hands as defendants. Chase asserted seven different causes of action related to

_____

[1] The district court dismissed Stephanie Hodge as a party on June 23, 2021.

3

Hodge's assertion of sole ownership of Helping Hands and sought a declaratory judgment and the appointment of a receiver. Helping Hands removed the case to federal district court based on diversity jurisdiction. All defendants filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b). Following limited discovery, Chase filed his first amended complaint in September 2020, which is the live complaint.

The defendants again filed Rule 12(b)(6) motions to dismiss. A magistrate judge issued a Report and Recommendation in May 2021, recommending the district court dismiss all claims against both defendants except those for breach of fiduciary duty and breach of contract, and also dismiss the requests for declaratory judgment and appointment of a receiver. The district court adopted this recommendation. Those rulings are not contested now.

In July 2022, the defendants filed a motion for summary judgment on Chase's remaining claims. The parties then consented to have all remaining proceedings, including entry of final judgment, conducted by a magistrate judge. *See* 28 U.S.C. § 636(c). Because the magistrate judge was assigned the court's authority, we will refer to the judge as the district court. In January 2023, the district court granted the defendants' summary judgment motion. After the court denied reconsideration, Chase timely appealed.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court. *Keller Founds., Inc. v. Wausau Underwriters Ins. Co.*, 626 F.3d 871, 873 (5th Cir. 2010). Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court's factual and legal conclusions are reviewed *de novo* when determining if there is a genuine issue of material fact.

*See Guy v. Cockrell*, 343 F.3d 348, 351 (5th Cir. 2003).  The evidence presented is viewed and any reasonable inferences are drawn in the light most favorable to the non-moving party.  *Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294, 298 (5th Cir. 2017).

Chase argues the district court erred in holding that (1) the statute of limitations barred his claims, (2) the statute of frauds prevents enforcement of the purported contract, and (3) the purported contract was too indefinite.  Chase further asserts he was entitled to a declaratory judgment and the appointment of a receiver.  Because this appeal can be resolved solely on the issue of the applicability of the statute of frauds, that is the only issue we address.

Under Texas law, promises and agreements are unenforceable if they fall within the statute of frauds.  TEX. BUS. & COM. CODE § 26.01.  Whether the statute of frauds applies to an agreement is a question of law.  *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 642 (Tex. 2013).  These defendants properly raised this affirmative defense in their answers to the amended complaint.  *See* TEX. R. CIV. P. 94.  The relevant state statute provides that if certain agreements are not in writing and signed by the party to be bound by the agreement, they are unenforceable.  BUS. & COM. § 26.01(a).  These requirements apply to, among other categories, agreements that are "not to be performed within one year from the date of making the agreement." § 26.01(b)(6).

Chase asserts the statute of frauds is inapplicable to his claims because the agreement could have been performed within one year.  The general principle is that if the terms of an agreement render it *impossible* to be completed within one year, the agreement is unenforceable without a signed writing.  *Hairston v. S. Methodist Univ.*, 441 S.W.3d 327, 333–34 (Tex. App.—Dallas 2013, pet. denied).  A different but consistent articulation is "that,

where the agreement, either by its terms *or by the nature of the required acts*, cannot be completed within one year, it falls within the statute and must therefore be in writing." *Niday v. Niday*, 643 S.W.2d 919, 920 (Tex. 1982) (emphasis in original) (citing *Hall v. Hall*, 308 S.W.2d 12 (1957)). The *Niday* court distinguished its holding from caselaw "that, where the parties do not fix the time of performance and the agreement itself does not indicate that it cannot be performed within one year, the contract does not violate the statute." *Id.* (citing *Miller v. Riata Cadillac Co.*, 517 S.W.2d 773 (Tex. 1974)). Even when a date for performance is not stated, the nature of the contract may mandate its existence for more than a year.

We have interpreted these holdings this way: "when no time for performance has been specified in the agreement, a reasonable time will be implied on the basis of all circumstances surrounding adoption of the agreement, the situation of the parties, and the subject matter of the agreement." *Mercer v. C. A. Roberts Co.*, 570 F.2d 1232, 1236 (5th Cir. 1978). Similarly, Texas state court opinions have occasionally relied on a finding of whether a reasonable time for performance of an oral contract would be more than one year. In *Hall*, the Texas Supreme Court found an oral contract for a manufacturing partner to develop sales territory that did not contain an explicit performance duration to be subject to the statute of frauds. *Hall*, 308 S.W.2d at 15–17. The court held that "[w]hat is a reasonable time must be determined by the circumstances in evidence surrounding the situation of the parties and the subject-matter under which the contract was executed." *Id.* at 16–17 (quotation marks and citations omitted).

Chase asserts it is error to look at the "intended performance of the agreement" rather than the possibility of performance within one year. He argues all that is necessary is the possibility the agreement could have been completed within one year. The caselaw we have just discussed, however, shows there is more nuance to the analysis than Chase acknowledges.

No. 23-50297

Specific categories of contracts in which a reasonable time has been considered when analyzing a statute of frauds issue include "exclusive franchise or distributorship agreements, which are indefinite in duration and which contemplate the expenditure of substantial sums of money or other investments by one of the parties preparatory to or in accordance with his performance under the contract." *Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385, 391 (Tex. 1977). Therefore, the nature of an agreement can cause a "reasonable duration" to be greater than one year and the contract to be unenforceable under the statute of frauds. *See Niday*, 643 S.W.2d at 920.

When analyzing the applicability of the statute of frauds, we may "use any reasonably clear method of ascertaining the intended length of performance . . . to determine the parties' intentions at the time of contracting." *Gerstacker v. Blum Consulting Eng'rs, Inc.*, 884 S.W.2d 845, 850 (Tex. App.—Dallas 1994, writ denied) (citing *Hall*, 308 S.W.2d at 16–17). The five-year duration of the agreement is immaterial; instead, we consider whether it was expected, based on the nature of the agreement at the time it was entered, that performance could have been concluded in less than a year. Quite relevant is Hodge's declaration where he explained Helping Hands' business model:

> I saw a need in the market for a litigation-funding company that provided nonrecourse funding to personal-injury claimants for living expenses, and I began discussing that opportunity with Mr. Chase and Mr. Guedri. The new potential litigation-funding company would operate in a similar fashion to HMR Funding, LLC [a business providing funding for medical expenses to personal-injury claimants], in that it would provide non-recourse funds to injured claimants, and would collect a fee (usually years later) if the claimant prevailed.

It is obvious the agreement Chase entered contemplated an endeavor that would take more than a year to perform, with expenditures and no income at first, and potential income as claims were settled or litigated. The nature of these contracts resembles exclusive franchise or distributorship agreements that "contemplate the expenditure of substantial sums of money or other investments by one of the parties preparatory to or in accordance with his performance under the contract." *Clear Lake City Water Auth.*, 549 S.W.2d at 391. Thus, to split the profits Helping Hands would eventually earn, performance needed to exceed one year. *Id.*

Chase responds to such reasoning by saying "it was expected that the agreement to start the company and share ownership equally would be completed within a matter of weeks. It certainly was expected that the agreement would be fulfilled within one year." The formation of Helping Hands was just the beginning of the performance under the agreement. While all these first steps could be taken in less than one year, that fact hardly matters as Chase himself insists the agreement was for more than that. This suit claims unpaid profits earned by the business. Chase states the agreement was a "contract to share profits," and the parties "entered into a contract to combine their efforts to make loans to finance litigation and split the profits that came from those efforts." It most certainly was not just an agreement to form a company, then walk away.

Viewing the evidence in the light most favorable to Chase, the circumstances surrounding the formation of the agreement and the subject-matter of the contract establish that it was an endeavor to last more than one year. *See Hall*, 308 S.W.2d at 16–17.

Chase also contends partial performance removes the agreement from the statute of frauds. Partial performance is an equitable exception to the statute of frauds, rendering an agreement enforceable even without a signed

writing. *National Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426 (Tex. 2015). The performance must indicate that an actual contract was made and "must be such as could have been done with *no other design* than to fulfill the particular agreement sought to be enforced." *Berryman's S. Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 193 (Tex. App.—Dallas 2013, pet. denied) (emphasis added) (quotation marks and citation omitted). "In other words, the purpose of the . . . performance must be to fulfill a specific agreement." *Westergren*, 453 S.W.3d at 426. If the performance does not precisely establish the specific contract sought, the statute of frauds still applies. *Id.* at 426–27.

The performance on which Chase relies is that he was paid money by Helping Hands. According to Chase, the district court erroneously determined these payments could have been for services Chase rendered to Helping Hands rather than partial performance of a profit-sharing, ownership agreement. Chase contends there was sufficient evidence of the agreement and its partial performance to remove it from the statute of frauds.

Both parties agree, at first, there was a profit-sharing agreement with 50/50 ownership in the profits of Helping Hands. Hodge later took the position that Chase had only an economic benefit in the company and denied that Chase has any ownership rights. Hodge submitted a declaration that described both Chase and Guedri as independent contractors for Helping Hands, and the funds they received were as independent contractors. Additionally, the tax documents Chase received were those paid to independent contractors who have no ownership interest in a company.

Texas law requires precision in the evidence establishing a contract based on partial performance. *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 440 (Tex. App.—Dallas 2002, pet. denied). Chase must show that the payments to him *could not have been made* except as a share of profits:

No. 23-50297

> The partial performance must be "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." The acts of performance relied upon to take a parol contract out of the statute of frauds must be such as *could have been done with no other design* than to fulfill the particular agreement sought to be enforced; otherwise, they do not tend to prove the existence of the parol agreement relied upon by the plaintiff.

*Id.* at 439–40 (emphasis added) (citations omitted).

The evidence here does not unequivocally support the existence of a profit-sharing contract. Both parties agreed to a profit-sharing agreement at one point, but Hodge's declaration and Chase's tax documentation provide a possible change in purpose of the payments to Chase and Guedri — their independent contracting work. The statute of frauds thus applies to Chase's efforts to enforce an oral agreement. AFFIRMED.